## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jeanna Kay Satterfield, | ) | C/A No.: 1:19-1474-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul,[1] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Cameron McGowan Currie, United States District Judge, dated May 23, 2019, referring this matter for disposition. [ECF No. 8]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 7].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"), Disabled Widow Benefits ("DWB"), and

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Nancy A. Berryhill.

Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.  Relevant Background

    A.  Procedural History

On July 22, 2015, Plaintiff filed applications for DIB, DWB, and SSI in which she alleged her disability began on May 26, 2015. Tr. at 147, 148, 149, 345–51, 352–63, 366–72. Her applications were denied initially and upon reconsideration. Tr. at 201–05, 206–10, 211–15, 220–24, 225–29, 230–34. On February 22, 2018, Plaintiff had a video hearing before Administrative Law Judge ("ALJ") Katie H. Pierce. Tr. at 45–72 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 11, 2018, finding Plaintiff was not disabled within the meaning of the Act. Tr. at 10–42. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 21, 2019. [ECF No. 1].

B. Plaintiff's Background and Medical History

1. Background

Plaintiff was 53 years old at the time of the hearing. Tr. at 51. She attended school through the eighth grade and did not obtain a high school equivalency certificate. *Id.* Her past relevant work ("PRW") was as a certified nursing assistant ("CNA") and a cloth inspector. Tr. at 62–63. She alleges she has been unable to work since May 26, 2015. Tr. at 345, 352, 367.

2. Medical History

On April 13, 2015, Plaintiff presented to Baptist Easley Hospital ("BEH") for chest pain. Tr. at 636. Joel S. Jurantee, M.D. ("Dr. Jurantee"), ordered a cardiology consultation. *Id.* A nuclear medicine stress test and an echocardiogram were normal. *Id.* Dr. Jurantee started Plaintiff on a low-dose beta blocker, aspirin, and a statin, as her obesity and tobacco use increased her risk for coronary artery disease. *Id.* He diagnosed hypothyroidism and prescribed Levothyroxine. *Id.*

On May 4, 2015, Plaintiff followed up with her primary care physician, George Sutter, M.D. ("Dr. Sutter"), for lab test results. Tr. at 720. She complained of difficulty sleeping, right shoulder pain, and blurred vision. *Id.* Dr. Sutter prescribed Doxepin for sleep. *Id.* He stated Plaintiff's right shoulder x-rays were within normal limits, but referred her to an orthopedist. *Id.* He also referred Plaintiff for a vision exam. *Id.*

On May 15, 2015, Plaintiff presented to the emergency room ("ER") at BEH for generalized body aches and chronic pain. Tr. at 660. She reported a history of fibromyalgia and indicated her pain and anxiety had worsened following her mother's death, two months prior. *Id.* She complained the free clinic would not prescribe narcotic medication for her pain. *Id.* David Franklin Carver, M.D. ("Dr. Carver"), noted normal findings on physical exam, aside from anxious mood and affect. Tr. at 662–63. He assessed grief reaction and chronic pain and prescribed Norco. Tr. at 663.

Plaintiff presented to Upstate Bone and Joint for evaluation of shoulder and neck pain on May 29, 2015. Tr. at 514. She described pain and paresthesia that radiated from her neck to her right upper extremity. *Id.* William Irvin PA-C ("PA Irvin"), noted diffuse tenderness in Plaintiff's cervical spine, right-sided paraspinous tenderness, and an area of trigger-point tenderness. *Id.* He stated Plaintiff had symmetric shoulder shrugs and 5/5 manual muscle strength in her bilateral upper extremities. *Id.* He noted free passive ROM of the shoulders, elbows, wrists, and hands, but observed some Heberden nodes of the hands. *Id.* He assessed cervical radiculopathy and indicated the impairment was "[w]orsening, [p]rogressing as expected." *Id.* He referred Plaintiff for cervical magnetic resonance imaging ("MRI"). *Id.*

On May 31, 2015, Plaintiff presented to the ER at BEH for neck pain that radiated to her right upper extremity. Tr. at 665. Stefanie J. Martinez,

NP ("NP Martinez"), observed painful range of motion ("ROM") and moderate, diffuse tenderness in Plaintiff's neck. Tr. at 666. She diagnosed cervical radiculopathy and prescribed Percocet 7.5-325 mg, Prednisone 10 mg, and Flexeril 10 mg. Tr. at 667. NP Martinez instructed Plaintiff to follow up with her primary care provider. *Id.*

Plaintiff presented to Pickens County Mental Health Center for an initial psychiatric medical assessment on June 3, 2015. Tr. at 688. She complained of depression and mood swings. *Id.* She described a history of depression that was characterized by the following symptoms during periods of acute exacerbation: isolation, staying in bed and sleeping more; poor sleep without feeling well-rested; crying; negative, ruminating thoughts; lack of enjoyment from normally-pleasurable activities; feelings of worthlessness, hopelessness, and helplessness; fatigue and low energy; poor concentration and memory; eating more or less; feeling irritable; and thoughts of death. *Id.* She endorsed a history of three suicide attempts through medication overdoses. *Id.* Plaintiff also described periods of mania characterized by feeling unusually good, having high energy, and going without sleep or feeling as if she needed little sleep. *Id.* Ervin D. Prewette, M.D. ("Dr. Prewette"), provided the following impressions on mental status exam: well-groomed appearance; cooperative attitude; calm behavior; normal eye contact; normal and articulate speech; logical/goal-directed thought process; denies

delusions; denies suicidal ideation; denies homicidal ideation; denies hallucinations; anxious mood; appropriate affect; alert sensorium; intact recent and remote memory; intact attention and concentration; average language; good judgment and insight; and average fund of knowledge. Tr. at 689. He diagnosed bipolar disorder, not otherwise specified ("NOS") and posttraumatic stress disorder ("PTSD") and assessed a global assessment of functioning ("GAF")[2] score of 60.[3] *Id.* He prescribed Paxil 40 mg, Vistaril 25 mg, and an initial dose of Lamictal 25 mg that he ordered Plaintiff to titrate up over time. Tr. at 689.

Plaintiff presented to Southern Eye Associates for an eye exam on June 16, 2015. Tr. at 521. Craig A. O'Dell, O.D. ("Dr. O'Dell"), diagnosed a nuclear sclerotic cataract, issued a prescription for glasses, and instructed Plaintiff to follow up in 12 months. Tr. at 525–26.

On June 23, 2015, the MRI of Plaintiff's cervical spine showed a disc bulge with a small central protrusion at C7–T1, mild spinal stenosis, no

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[3] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

significant foraminal encroachment, and multilevel degenerative changes. Tr. at 531–32, 533–34.

On June 24, 2015, Plaintiff complained that Meloxicam 15 mg was not helping her pain and requested a high dose of ibuprofen. Tr. at 718. Dr. Sutter prescribed ibuprofen 800 mg, but instructed Plaintiff not to take it with Meloxicam. *Id.*

Plaintiff followed up with Dr. Sutter to discuss the MRI of her cervical spine on July 1, 2015. Tr. at 717. Dr. Sutter noted Plaintiff was "crying and want[ed] more pills." *Id.* He declined to prescribe pain medication. *Id.* He noted Plaintiff should likely visit a neurosurgeon, but that he could not refer her. *Id.* He recommended Plaintiff contact New Horizon or possibly St. Francis for financial assistance. *Id.*

Plaintiff presented to the ER at St. Francis Downtown with a complaint of shoulder pain on July 2, 2015. Tr. at 930. Thomas J. Watts, D.O. ("Dr. Watts"), noted normal ROM of the neck, normal musculoskeletal ROM, no musculoskeletal edema or tenderness, and normal mood, affect, and behavior on physical exam. Tr. at 935. He assessed a pinched nerve in Plaintiff's neck and prescribed Norco 5-325 mg and Prednisone 20 mg. Tr. at 937, 941.

On July 20, 2015, Plaintiff reported more stable mood and decreased irritability since starting Lamictal. Tr. at 691. She endorsed difficulty falling asleep, mild and persistent depression, and frequent and persistent anxiety,

but denied episodes of hypomania. *Id.* She requested a prescription for Paxil. *Id.* Kathy M. Waggett, M.D. ("Dr. Waggett"), noted the following on mental status exam: well-groomed appearance, calm behavior, normal and spontaneous speech, intact associations, denied suicidal and homicidal ideation, denied hallucinations, depressed mood, constricted affect, and fair insight and judgment. Tr. at 691. She assessed a GAF score of 58 and prescribed Lamictal, Vistaril, and Paxil. *Id.*

Plaintiff also presented to Dr. Sutter on July 20, 2015. Tr. at 715. Dr. Sutter noted Plaintiff was "[c]rying with neck pain. *Id.* Plaintiff reported she had been unable to afford to see a neurosurgeon. *Id.* Dr. Sutter advised her to visit local hospitals to apply for sponsorship. *Id.*

Plaintiff presented to the ER at BEH on July 25, 2015, for a possible medication reaction, cough, and malaise. Tr. at 669. Aisha C. Jennings, M.D. ("Dr. Jennings"), diagnosed viral syndrome, medication reaction, and elevated liver function. Tr. at 672.

Plaintiff returned to the ER at BEH on July 27, 2015, for nausea, papular pruritic rash, and body aches. Tr. at 675. Robert B. Vaughn, PA ("PA Vaughn"), diagnosed an allergic reaction to medication and prescribed Hydroxyzine Pamoate 50 mg. Tr. at 677.

Plaintiff presented to Greenville Memorial Medical Center ("GMMC") for leg weakness, pain, swelling, rash, chest pressure, and tachycardia on

August 14, 2015. Tr. at 569. She indicated she had noticed the symptoms after starting Lamictal. *Id.* Daniel A. Dillon M.D. ("Dr. Dillon"), diagnosed folliculitis and drug reaction. Tr. at 566.

On August 26, 2015, Plaintiff reported anxiety, cough, and right lower chest pain. Tr. at 712. Dr. Sutter indicated Plaintiff's lungs sounded clear, but that she needed to stop smoking. *Id.* He prescribed Cipro 500 mg, Promethazine DM syrup, and Hydroxyzine PAM 25 mg. *Id.*

On September 1, 2015, Plaintiff presented to Cannon Memorial Hospital ("CMH") for sharp pain in her right lung. Tr. at 545. A chest x-ray was normal. Tr. at 553. James Caldwell, M.D. ("Dr. Caldwell"), diagnosed rib pain and chest wall pain and discharged Plaintiff with prescriptions for Prednisone 10 mg and Norco 10-325 mg. Tr. at 552.

Plaintiff again presented to CMH on September 8, 2015, with complaints of a rash, bumps in her mouth, and blurred vision. Tr. at 542. Tony Rana, M.D. ("Dr. Rana"), diagnosed mouth ulcer and medication reaction. Tr. at 540.

On September 9, 2015, Plaintiff complained of blurred vision and trouble breathing, particularly while lying down. Tr. at 710. Dr. Sutter indicated Plaintiff's blood pressure was elevated at 150/97 mm/Hg. *Id.* He prescribed Lasix 20 mg and a Ventolin inhaler. *Id.*

On September 11, 2015, Plaintiff presented to GMMC, complaining that she had first noticed blurred vision three days prior. Tr. at 612. Plaintiff's blood glucose was over 500 mg/dL. Tr. at 614. Brock H. Helms, D.O. ("Dr. Helms"), diagnosed hyperglycemia likely secondary to diabetes mellitus, type II. *Id.*

On September 14, 2015, Plaintiff follow up with Dr. Sutter regarding elevated blood sugar. Tr. at 709. He prescribed Metformin and referred Plaintiff for lab work to determine her hemoglobin A1c level. *Id.*

Plaintiff followed up with Dr. Sutter to discuss lab test results on September 16, 2015. Tr. at 707. She indicated she was willing to start insulin to decrease her blood sugar. *Id.* Dr. Sutter diagnosed diabetes mellitus and indicated he would start Plaintiff on 10 units of Novolin N and titrate her dose as needed. *Id.*

On September 21, 2015, Plaintiff reported she had discontinued Lamictal following an allergic reaction. Tr. at 693. She reported her mood had improved significantly after starting Paxil, but endorsed increased anxiety, insomnia, and irritability after discontinuing Lamictal. *Id.* She described variable appetite and sleep disturbance characterized by frequent or prolonged awakenings and difficulty falling asleep. *Id.* Dr. Waggett observed the following on mental status exam: well-groomed appearance; calm behavior; normal and spontaneous speech; intact associations; logical

and goal-directed thought process; denied hallucinations and delusions; denied suicidal and homicidal ideation; euthymic mood; appropriate affect; and good judgment and insight. *Id.* She added a prescription for Risperdal. *Id.*

Plaintiff also followed up with Dr. Sutter on September 21, 2015. Tr. at 706. She indicated she had discontinued Metformin because it was upsetting her stomach. *Id.* She stated her blood glucose level had recently been in the 300s. *Id.* Dr. Sutter instructed Plaintiff to start 10 units of insulin per day and to titrate up her dose. *Id.*

Plaintiff presented to the ER at BEH on September 24, 2015, for pain and swelling in her right foot. Tr. at 679. X-rays of Plaintiff's right foot showed mild hallux valgus deformity of the right first metacarpophalangeal joint and mild osteoarthritic changes, but no acute bony abnormalities. Tr. at 682. Dr. Martinez observed tenderness, swelling, and restricted ROM in Plaintiff's right tarsal region. Tr. at 681. She assessed right foot sprain and prescribed Tylenol with Codeine and Diclofenac Sodium 75 mg. Tr. at 681.

On October 5, 2015, Plaintiff reported her blood glucose level was typically running in the upper 100s. Tr. at 705. Dr. Sutter instructed Plaintiff to stop varying her insulin dose and to take 40 units of Novolin N in the morning and 20 units in the evening. *Id.* Plaintiff endorsed blurred vision,

and Dr. Sutter indicated her vision might improve if her blood sugar were controlled. *Id.*

On October 13, 2015, Plaintiff reported she had discontinued Risperdal after having a serious allergic reaction. Tr. at 695. She endorsed the following symptoms: persistent, mild depression; frequent irritability; persistent chronic fatigue and inactivity; persistent, frequent anxiety; and insomnia. *Id.* Dr. Waggett noted the following on mental status exam: well-groomed appearance; calm behavior; normal and spontaneous speech; intact associations; logical and goal-directed thought process; denies hallucinations and delusions; denies suicidal and homicidal ideation; euthymic mood; appropriate affect; and good judgment and insight. *Id.* She discontinued Vistaril and Risperdal and prescribed Abilify. *Id.*

On October 21, 2015, Plaintiff followed up with Dr. Sutter regarding her blood sugar readings. Tr. at 703. Dr. Sutter prescribed an antibiotic for cough and congestion. *Id.* He stated Plaintiff's blood sugars ranged from 70 to 100. *Id.* He instructed her to take 40 units of Novolin N insulin in the morning and 25 units in the evening. *Id.* Plaintiff requested Chantix for smoking cessation, and Dr. Sutter prescribed it. *Id.*

Plaintiff reported episodes of difficulty breathing on October 28, 2015. Tr. at 702. Dr. Sutter prescribed a Ventolin inhaler. *Id.* Plaintiff followed up with Dr. Sutter for medication refills on November 16, 2015. Tr. at 700.

On November 23, 2015, Plaintiff reported she had discontinued Paxil three weeks prior because she felt like she no longer needed it. Tr. at 757. She indicated she used Vistaril for occasional mild anxiety. *Id.* She endorsed improved mood since starting Abilify and denied significant depression, irritability, mood instability, and hypomania. *Id.* Despite its positive effects, Plaintiff stated she could not afford Abilify and agreed to switch to Seroquel. *Id.* Dr. Waggett noted the following on mental status exam: well-groomed appearance; calm behavior; normal and spontaneous speech; intact associations; logical and goal-directed thought process; denies delusions and hallucinations; denies suicidal and homicidal ideation; euthymic mood; appropriate affect; and good insight and judgment. *Id.*

On December 7, 2015, state agency consultant Xanthia Harkness, Ph.D. ("Dr. Harkness"), reviewed the record and completed a psychiatric review technique ("PRT"). Tr. at 110–11, 124–25, 138–39. She considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and assessed a mild degree of limitation as to restriction of activities of daily living ("ADLs") and difficulties in maintaining concentration, persistence, or pace. Tr. at 110. She assessed moderate limitation as to maintaining social functioning. *Id.* Dr. Harkness noted Plaintiff "appears to have a severe impairment that would not preclude the ability to carry out simple and detailed tasks in a setting that does not require frequent public contact." Tr.

at 111. She completed a mental residual functional capacity ("RFC") assessment and assessed moderate impairment with respect to Plaintiff's abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 115–16, 129–30, 143–44.

Plaintiff presented to W. Russell Rowland, M.D. ("Dr. Rowland"), for a consultative examination on January 25, 2016. Tr. at 735–41. Dr. Rowland noted Plaintiff was 5' tall and weighed 238 pounds. Tr. at 736. He observed an area of scleroderma on Plaintiff's right forearm. Tr. at 738. He noted abduction to 130 degrees and flexion to 120 degrees, but otherwise normal ROM of Plaintiff's right shoulder. *Id.* He indicated abduction and flexion to 90 degrees and normal adduction and internal and external rotation of the left shoulder. *Id.* He observed normal ROM of Plaintiff's elbows, wrists, thumbs, and fingers. *Id.* He noted small, nontender Heberden's nodes on Plaintiff's third, fourth, and fifth left distal interphalangeal joints, as well as on her right second, third, and fourth fingers. *Id.* Dr. Rowland stated Plaintiff demonstrated no crepitus or tenderness of either shoulder joint and showed 5/5 strength and grip in the upper extremities. Tr. at 739. He noted hip flexion to 95 degrees and normal internal and external rotation of the hips. *Id.* He stated Plaintiff's right knee flexed to 110 degrees, her left knee flexed to 120 degrees, and both extended to zero degrees. *Id.* He observed normal

ROM of Plaintiff's ankles. *Id.* He noted no crepitus, tenderness, joint effusion, or bony enlargement of Plaintiff's knees. *Id.* He indicated Plaintiff had 5/5 strength in her lower extremities and squatted 20%. *Id.* Dr. Rowland noted 1+ and "difficult to feel" pedal pulses in the posterior tibialis. *Id.* He stated Plaintiff had normal alignment of the spine and no muscle spasm, tenderness, or sacroiliac tenderness. *Id.* Plaintiff demonstrated normal flexion of the cervical spine and normal side bending on the right and left, but extension to 25 degrees, right rotation to 40 degrees, and left rotation to 45 degrees. *Id.* Dr. Rowland recorded true lumbar flexion to 20 degrees, but stated it was not accurate due to Plaintiff's very obese abdomen. *Id.* He noted lumbar extension to five degrees and bilateral side bending to 10 degrees. *Id.* He found Plaintiff to have normal deep tendon reflexes in her knees and ankles, but absent deep tendon reflexes in her upper extremities. *Id.* He stated a straight leg raising ("SLR") test was negative. *Id.* Dr. Rowland noted no abnormalities on neurologic testing. *Id.* He provided the following impressions: pain and decreased ROM of the shoulders, likely unrelated to the cervical spine; high blood pressure; diabetes mellitus with normal neurological examination; marked obesity with very poor endurance and inactivity; generalized myalgias without evidence of fibromyalgia; complaints of aching in the knees with normal examination; chronic low back pain with some degenerative disc disease, but no objective radiculopathy; localized skin

scleroderma with no evidence of systemic scleroderma; cough syncope secondary to chronic cigarette abuse; diagnoses of bipolar, anxiety, and depression, stable on medications and with treatment; blurred vision corrected by reading glasses; and some mild, posterior cervical pain and decreased ROM of the cervical spine without evidence of radiculopathy. Tr. at 739–40. He assessed marked obesity and chronic cigarette abuse. Tr. at 740.

X-rays of Plaintiff's lumbar spine dated January 25, 2016, showed moderately-large to large anterior osteophytes with mild right-sided disc narrowing at the L3–4 and L4–5 levels and mild-to-moderate facet arthropathy at the L5–S1 level. Tr. at 732. X-rays of her right knee showed large osteophytes along all three joint lines with narrowing of the patellofemoral joint compartment; heterotopic bone formation along the superior margin of the patellofemoral joint line associated with anterior distal femur and patella; mild-to-moderate joint narrowing of the lateral joint compartment; and evidence of a small joint effusion. Tr. at 733.

Plaintiff complained of back problems, weakness, and feeling as if she were going to pass out on February 10, 2016. Tr. at 1002. Dr. Sutter decreased Plaintiff's dose of Metoprolol and increased her dose of Novolin N. *Id.*

On February 17, 2016, state agency medical consultant Carl Anderson, M.D. ("Dr. Anderson"), reviewed the record and assessed Plaintiff's physical

RFC as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; occasionally climbing ladders, ropes, and scaffolds; and avoiding concentrated exposure to hazards. Tr. at 112–15, 126–29, 140–43. A second state agency medical consultant, William Hopkins, M.D. ("Dr. Hopkins"), assessed the same physical RFC on June 9, 2016. Tr. at 159–62, 175–78, 191–94.

Plaintiff presented to Kimberly Jordan, NP ("NP Jordan"), for a gynecological exam on February 25, 2016. Tr. at 1000. She reported difficulty sleeping and unsteadiness resulting in falls. *Id.* NP Jordan indicated Plaintiff's gynecological exam was normal. *Id.* She encouraged Plaintiff to follow a low carbohydrate diet and to exercise as tolerated. *Id.*

On February 26, 2016, Plaintiff presented to the ER at BEH with pain and contusions to her neck and back. Tr. at 1095. She reported having tripped and fallen. *Id.* Robert M. Hellams, M.D. ("Dr. Hellams"), observed Plaintiff to be in mild distress. Tr. at 1096. He noted bilateral, moderate, diffuse tenderness to Plaintiff's posterior, lower cervical spine; mild tenderness to her right, lateral lumbar spine; and mild tenderness to her right sacral spine. *Id.* X-rays of Plaintiff's cervical spine showed no acute

fracture and indicated possible disc space narrowing at the C5–6 level. Tr. at 1098. X-rays of her lumbar spine showed slightly narrowed disc space at L2–3, some hypertrophic changes of the lumbar facet joints at L5–S1 and possibly L4–5, and mild degenerative changes of the hips without joint space narrowing. Tr. at 1100. Dr. Hellams assessed neck and lumbar contusions and prescribed Flexeril 10 mg and Percocet 5-325 mg. Tr. at 1097.

On March 17, 2016, Plaintiff complained of chest pain, and Dr. Sutter referred her to a cardiologist. Tr. at 999. Plaintiff presented to Shawn K. Mathias, M.D. ("Dr. Mathias"), for a cardiac consultation on March 28, 2016. Tr. at 748. She described achy chest pain and tightness that was exacerbated by walking. *Id.* She also endorsed fatigue, shortness of breath, right arm pain, and leg pain. *Id.* Dr. Mathias noted no abnormalities on physical exam. Tr. at 750. He ordered a nuclear stress test, a cardiac stress test, an echocardiogram, and a pocket 12-lead electrocardiogram. *Id.* He instructed Plaintiff to take 81 mg of aspirin daily and prescribed Pravastatin 40 mg and Carvedilol 6.25 mg. Tr. at 751. He encouraged Plaintiff to cease smoking. *Id.*

On May 4, 2016, Plaintiff indicated she continued to struggle with her parents' deaths. Tr. at 760. She stated Paxil was not as effective and indicated Effexor had helped in the past. *Id.* She reported she was no longer taking Seroquel because it caused nightmares. *Id.* Dr. Waggett noted the following on mental status exam: appearance within normal limits;

cooperative attitude; calm behavior; normal eye contact; normal speech; intact associations; logical and goal-directed thought process; denies hallucinations and delusions; admits suicidal ideation without plan; denies homicidal ideation; denies obsessions; depressed mood; appropriate affect; alert sensorium; oriented to time, place, person, and circumstance; mild impairment to recent memory; intact remote memory; intact attention and concentration; average language and fund of knowledge; and good insight and judgment. *Id.* She discontinued Seroquel, increased Paxil, and prescribed Ambien. Tr. at 760–61.

State agency consultant Silvie Ward, Ph.D. ("Dr. Ward"), completed a PRT on June 8, 2016, considering Listings 12.04 and 12.06 and assessing a moderate degree of limitation in maintaining social functioning and a mild degree of limitation in restriction of ADLs and difficulties in maintaining concentration, persistence, or pace. Tr. at 156–58, 172–74, 188–90. She assessed moderate limitation in Plaintiff's abilities to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. Tr. at 162–63, 178–79, 194–95.

Plaintiff presented to the ER at BEH on July 25, 2016, for a one-week history of shortness of breath and upper back pain. Tr. at 1083. Dr. Carver noted high respiratory and peripheral pulse rates, as well as tachypneic, labored respirations with mild wheezes. Tr. at 1085. A computed tomography

("CT") angiogram showed chronic changes in the periphery of the upper lobe of Plaintiff's right lung and a focus of scarring in the right posterior costophrenic angle. Tr. at 1089. Dr. Carver diagnosed chronic obstructive pulmonary disease ("COPD") with exacerbation and prescribed Prednisone 20 mg and Levaquin 500 mg. Tr. at 1088.

Plaintiff presented to Dr. Sutter with a complaint of worsened COPD on August 8, 2016. Tr. at 994. She reported she had stopped smoking four months prior, but continued to have a chronic, cry cough. Tr. at 994. Dr. Sutter prescribed Ventolin HFA, Symbicort 80/4.5, Spiriva 18, and Dulera 100/5. *Id.*

Plaintiff complained of shortness of breath on August 15, 2016. Tr. at 991. Dr. Sutter noted Plaintiff had failed to fill the prescription for Spiriva he provided during her prior visit. *Id.* He again ordered Spiriva. *Id.*

Plaintiff presented to the ER at BEH on August 19, 2016, for dyspnea. Tr. at 1074. Jessica G. Bell, NP ("NP Bell"), noted no abnormalities on physical exam. Tr. at 1075–76. She assessed COPD flare and prescribed Prednisone 10 mg. Tr. at 1076.

Plaintiff presented to the ER at BEH on August 22, 2016, for shortness of breath. Tr. at 1066. Kenneth Campbell, M.D. ("Dr. Campbell"), noted no abnormalities on physical exam. Tr. at 1068. A chest x-ray was normal. Tr. at 1072. Dr. Campbell assessed dyspnea and instructed Plaintiff to drink plenty

of fluids and to follow up with her doctor within one to two weeks. Tr. at 1069.

On October 17, 2016, Plaintiff reported depression and anxiety were "interfering with her ability to function on a daily basis." Tr. at 989. Janice Lee, FNP ("NP Lee"), observed Plaintiff to be tearful, but to demonstrate appropriate affect and good hygiene. *Id.* She encouraged Plaintiff to engage in positive behaviors such as journaling, walking, weight loss, diet, exercise, and positive thinking. *Id.* She indicated she would consider prescribing Prozac after obtaining lab work. Tr. at 990.

Plaintiff followed up with NP Lee on October 19, 2016. Tr. at 987. She indicated she had stopped taking Prozac in the past because of elevated liver enzymes, but desired to take it again. *Id.* Plaintiff's lab work showed normal liver enzymes, but a low Vitamin D level. *Id.* NP Lee prescribed Prozac and Vitamin D and instructed Plaintiff to wean off Cymbalta. Tr. at 988.

Plaintiff presented to NP Lee with a one-week history of severe neck pain on November 21, 2016. Tr. at 985. NP Lee noted Plaintiff was "in obvious pain." *Id.* She stated Plaintiff was oriented to person, place, and time and had normal and appropriate mood and affect. *Id.* She observed bilateral spasms to Plaintiff's trapezium muscles, diffuse tenderness to the posterior aspect of the cervical spine, limited ROM due to pain, bilateral grip strength within normal limits, and positive radial pulses. Tr. at 986. She administered

a Depo-Medrol injection, instructed Plaintiff to apply Lidocaine patches to her neck, referred Plaintiff to a neurosurgeon, and prescribed Amitriptyline for sleep. *Id.*

Plaintiff complained of neck and low back pain that radiated down her bilateral legs on November 28, 2016. Tr. at 983. She endorsed a 15-year history of symptoms that had worsened over the prior year. *Id.* NP Lee noted Plaintiff appeared to be in pain. *Id.* She stated Plaintiff was oriented to person, place, and time and had normal and appropriate mood and affect for the situation. *Id.* She observed the following: bilateral spasms to the trapezium muscles; diffuse tenderness to the posterior aspect of the cervical spine; limited cervical ROM due to pain; bilateral grip strength within normal limits; focal tenderness of the posterior aspect of the lumbar spine; limited lumbar ROM due to pain; positive bilateral SLR; normal peripheral pulses in lower extremities; intact and symmetrical sensation in all dermatomes of the lower extremities; 4/5 muscle strength; normal muscle tone; 2+ deep tendon reflexes; and good coordination. Tr. at 984. She prescribed Baclofen to be used as needed and instructed Plaintiff to continue using Lidocaine patches. *Id.*

On December 29, 2016, Plaintiff complained of back pain that was worse on the left and radiated down the posterior aspect of her left leg. Tr. at 981. She described the pain as being present for three weeks and preventing

her from "get[ting] comfortable." *Id.* She indicated some improvement in her neck pain. *Id.* She requested a pain management referral. *Id.* NP Lee observed Plaintiff to appear to be in pain. Tr. at 982. She noted Plaintiff was oriented to person, place, and time and demonstrated normal and appropriate mood and affect. *Id.* She found: erythema/edema in Plaintiff's right knee; no gross abnormality to the spine; tenderness to palpation to the left, mid-to-low back; lumbar ROM within functional limits with complaints of pain; 2/2 peripheral pulses in the lower extremities; no pedal edema; 5/5 strength; and inability to walk on heels and toes without difficulty. Tr. at 982. NP Lee administered a Depo-Medrol injection, ordered an x-ray of the lumbar spine, and discussed weight loss and exercise and a pain management referral. *Id.* She prescribed Tramadol HCl 50 mg for pain. *Id.*

Plaintiff presented to the ER at BEH on December 31, 2016, for back pain, generalized malaise, and dysuria. Tr. at 1054. X-rays of Plaintiff's lumbar spine showed normal spinal alignment and well-maintained vertebral body heights. Tr. at 1050. They indicated persistent, mild intervertebral disc space narrowing at the L1–2 level and arthropathy at the L4–S1 levels. *Id.* X-rays of Plaintiff's cervical spine showed persistent, minimal, and likely-degenerative anterolisthesis of C4 and C5 and bilateral neural foraminal narrowing from C4 to C6. Tr. at 1052. They indicated normal alignment in the remainder of the cervical spine and well-maintained cervical vertebral

body heights. *Id.* NP Martinez noted diffuse, posterior tenderness to Plaintiff's neck and diffuse tenderness to her lumbar spine with positive SLR in the supine position. Tr. at 1056. She assessed chronic back pain, chronic neck pain, degenerative disc disease, and acute sinus infection. Tr. at 1058. She prescribed Amoxicillin 875 mg and Hydrocodone 7.5-325 mg. *Id.*

Plaintiff complained of continued neck and back pain on January 5, 2017. Tr. at 979. She reported a headache and visual disturbance secondary to falling and hitting her head. *Id.* NP Lee noted Plaintiff appeared to be in pain. *Id.* She indicated Plaintiff was oriented to person, place, and time; demonstrated normal and appropriate mood and affect; and had slight, resolving ecchymosis over her left eye. Tr. at 979–80. NP Lee instructed Plaintiff to go to the ER for head injury assessment. Tr. at 980.

Plaintiff visited the ER at BEH later that day. Tr. at 1041. PA Vaughn noted elevated heart rate, but no other abnormalities on physical exam. Tr. at 1042–43. A CT scan of Plaintiff's head showed no acute intracranial abnormalities, but indicated post-craniotomy change in the right parietal region. Tr. at 1043. X-rays of Plaintiff's spine showed poor visualization, but were generally unremarkable. Tr. at 1044. PA Vaughn assessed neck pain, head contusion, and concussion. *Id.*

On January 18, 2017, Plaintiff complained of a four-day history of right upper quadrant pain that radiated to her back. Tr. at 977. NP Lee noted

Plaintiff appeared to be uncomfortable and in pain and changed positions constantly during the exam. *Id.* She further observed Plaintiff to be oriented to person, place, and time; to demonstrate normal and appropriate mood and affect; to have lumbar ROM within functional limits with complaints of pain; to have 2/2 peripheral pulses in her lower extremities; and to show 5/5 strength. *Id.* She referred Plaintiff for an abdominal CT scan, which was unremarkable. Tr. at 978, 1038–39.

On January 23, 2017, Plaintiff presented to St. Francis Downtown for shortness of breath and left chest pain and tightness that had initially begun four days prior. Tr. at 771. A physical exam was normal. Tr. at 773. Plaintiff was admitted for cardiology consultation. Tr. at 775. Cardiac enzymes were negative, and a cardiac catheterization showed normal coronary arteries. Tr. at 776. Kelly A. Valetti, PA ("PA Valetti"), released Plaintiff the following day with instructions to follow up with Dr. Mathias. *Id.*

Plaintiff underwent an upper gastrointestinal ("GI") and small bowel series on February 15, 2017. Tr. at 1036. It showed small duodenal diverticulum, but was otherwise unremarkable. *Id.*

On February 23, 2017, Plaintiff followed up with NP Lee to discuss results of the upper GI series and lab work up for joint pain. Tr. at 974. She reported difficulty coping with her parents' deaths three years prior. *Id.* She indicated she had discontinued mental health services because she was

unhappy with her counselor and psychiatrist. *Id.* NP Lee observed that Plaintiff was tearful and crying and appeared to be sad and in pain. *Id.* She assessed low back pain, anxiety, shoulder pain, neck pain, and colon diverticula. Tr. at 975. She administered a Kenalog injection for generalized aches and pains. *Id.* She continued Seroquel and Cymbalta, but indicated she would consider changing Plaintiff's antidepressant in the future. *Id.*

Plaintiff complained to NP Lee of breathing difficulty on March 6, 2017. Tr. at 972. She generally reported eating better and feeling better, aside from waking "gasping for breath." *Id.* NP Lee recommended a sleep study and hormone therapy. Tr. at 973. She advised Plaintiff to increase her dose of Ranitidine, to sleep with the head of her bed elevated, to avoid eating after 8:00 PM, and to continue nutritional counseling. *Id.*

On May 8, 2017, Plaintiff complained of increased right knee pain and anxiety following her husband's job loss. Tr. at 970. She requested a steroid injection. *Id.* NP Lee noted Plaintiff ambulated with a limp and required assistance getting on to the exam table. *Id.* She observed localized effusion and pain with palpation of Plaintiff's left knee. *Id.* She noted valgus alignment and fine crepitus with knee flexion and extension of the right knee. Tr. at 971. NP Lee informed Plaintiff of conservative treatment options. *Id.* She recommended joint aspiration and cortisone injection, and Plaintiff agreed to the treatment. *Id.*

On May 11, 2017, Plaintiff reported no relief from the recent steroid injection. Tr. at 969. Dr. Sutter ordered an x-ray and prescribed Meloxicam 15 mg and Ranitidine 150 mg. *Id.*

Plaintiff followed up with NP Lee on May 18, 2017. Tr. at 965. NP Lee observed Plaintiff to ambulate with a limp and to require assistance getting on to the exam table. *Id.* She noted the following on right knee exam: no external signs of injury or trauma; valgus alignment; mild fine crepitus with flexion and extension; joint stable to stressing in all planes; full ROM; tenderness to palpation at the medial joint line; 5/5 muscle strength; normal muscle tone; normal peripheral pulses; intact and symmetrical sensation in all dermatomes; and no pedal edema. *Id.* She ordered x-rays of Plaintiff's right knee that showed degenerative changes of the patellofemoral joint with significant narrowing of the joint space; degenerative changes of the tibiofemoral joint with narrowing of the medial compartment; and no loose bodies, fractures, or focal bony lesions. Tr. at 762.

On May 19, 2017, Plaintiff presented to the ER at BEH with right knee pain and swelling. Tr. at 1028. Ryan P. Stolzfus, PA ("PA Stolzfus"), noted swelling, tenderness, and limited ROM of Plaintiff's right anterior knee. Tr. at 1030. He ordered a Morphine 5 mg injection. *Id.*

Plaintiff presented to NP Lee for knee pain on May 24, 2017. Tr. at 963. She indicated her medication was not effectively addressing her pain. *Id.* NP

Lee observed Plaintiff to ambulate with a limp and require assistance getting on to the exam table. *Id.* She stated Plaintiff's knee examination was unchanged. *Id.* She referred Plaintiff to an orthopedist. Tr. at 964.

On June 1, 2017, Plaintiff presented to BEH with right knee pain and swelling that was exacerbated by bearing weight and walking. Tr. at 1024. Karen Ardis, M.D. ("Dr. Ardis"), observed tenderness, swelling, and restricted ROM of Plaintiff's right anterior knee. Tr. at 1025. She prescribed Diclofenac Sodium 75 mg and Norco 5-325 mg. Tr. at 1026.

Plaintiff presented to NP Lee for knee pain on June 12, 2017. Tr. at 961. NP Lee observed Plaintiff to be anxious and crying. *Id.* She stated Plaintiff had been informed by the orthopedist that she would need to lose weight and exercise prior to undergoing knee replacement surgery. *Id.* Plaintiff also stated her neck pain was flaring up. *Id.* NP Lee noted Plaintiff was walking with a limp and required assistance to get on to the exam table. Tr. at 962. She indicated Plaintiff's knee and neck exams were unchanged. *Id.* She prescribed Vistaril for anxiety and Baclofen for neck pain and encouraged Plaintiff to seek medical sponsorship for surgery and to follow up with another orthopedist. *Id.*

Plaintiff presented to Brandon Scott Huggins, M.D. ("Dr. Huggins"), for right knee pain on July 5, 2017. Tr. at 1150. She reported a recent cortisone injection had worsened her right knee pain. *Id.* Dr. Huggins noted no acute

swelling or significant joint effusion to Plaintiff's right knee. Tr. at 1150. He stated Plaintiff was tender to palpation over the medial patellar facet and medial and lateral joint lines. *Id.* He indicated she had full extension to 110 degrees and flexion limited secondary to pain. *Id.* X-rays of Plaintiff's bilateral knees showed evidence of bilateral, multicompartmental degenerative disease that was most pronounced in the medial compartment of the right knee and the lateral compartment of the left knee. Tr. at 1146. They also indicated extensive calcifications superior and lateral to the right patella that might reflect calcific joint loose bodies. *Id.* Plaintiff elected to proceed with another corticosteroid injection. Tr. at 1151. Dr. Huggins prescribed Tramadol 50 mg and Mobic 15 mg and discontinued Diclofenac. *Id.*

On July 19, 2017, Plaintiff rated her pain as a seven of 10. Tr. at 1125. She reported no relief from the most recent corticosteroid injection. *Id.* Dr. Huggins noted no acute swelling or significant joint effusion to Plaintiff's right knee. Tr. at 1126. He stated Plaintiff was tender to palpation over the medial patellar facet and medial and lateral joint lines. *Id.* He indicated she had full extension to 110 degrees and flexion limited secondary to pain. *Id.* He assessed primary osteoarthritis of the right knee. *Id.* He indicated Plaintiff should bear weight with her right upper extremity as tolerated. *Id.* He continued Plaintiff's prescription for Mobic, and administered a viscous supplementation injection ("VSI"). Tr. at 1123–24, 1126.

Plaintiff followed up with Dr. Huggins on July 26, 2017. Tr. at 1106. Dr. Huggins noted no acute swelling or significant joint effusion of the right knee, but indicated tenderness to palpation over the medial patellar facet and medial and lateral joint lines. Tr. at 1108. He noted flexion was limited by pain. *Id.* He administered a second VSI to Plaintiff's right knee. Tr. at 1105.

Plaintiff presented to NP Jordan for a gynecological exam on September 7, 2017. Tr. at 959. She complained of depression and stated no one cared about her and she did not care if she died. Tr. at 959–60. NP Jordan encouraged Plaintiff to be more active, to pursue diet counseling, and to follow up with NP Lee for depression. Tr. at 960.

On September 21, 2017, Plaintiff reported she had been crying more often and feeling more depressed, but felt better after restarting Cymbalta 30 mg. Tr. at 957. She indicated Voltaren helped her knee pain, but she was out of the medication. *Id.* She requested a cortisone injection for neck pain. *Id.* NP Lee observed Plaintiff to be oriented times three, to demonstrate appropriate affect and hygiene, and to be smiling, talkative, and laughing. *Id.* She indicated Plaintiff's knee, neck, and back exams were unchanged and she was ambulating well without antalgic gait or assistive aids. Tr. at 958. She refilled Plaintiff's medication and administered a cortisone injection. *Id.*

Plaintiff presented to the ER at BEH for lower extremity swelling and right knee pain on November 24, 2017. Tr. at 1009. Laurie L. Malstrom, M.D.

("Dr. Malstrom"), noted tenderness, swelling, and effusion in Plaintiff's right knee. Tr. at 1010. X-rays of Plaintiff's right knee showed moderate-to-severe degenerative change with no acute abnormalities. Tr. at 1012. Dr. Malstrom prescribed Norco, instructed Plaintiff to follow up with her primary care provider, and advised Plaintiff to avoid bearing weight on her right leg for two-to-three days. Tr. at 1010.

      C.    The Administrative Proceedings

          1.    The Administrative Hearing

             a.    Plaintiff's Testimony

At the hearing, Plaintiff testified she had not worked since May 26, 2015. Tr. at 51. She testified she last worked as a CNA, but could no longer perform the job because she had lost neck function and her back pain prevented her from walking for more than five minutes before needing to stop and rest. Tr. at 52–54. She said she was unable to turn her head from side to side and her pain caused problems with her "nerves." Tr. at 53. She described having difficulty reaching overhead and only being able to lift her arms halfway due to neck problems. *Id.* She said she was able to reach out to the side at chest height, but could not hold her arms out very long. *Id.* She described numbness that ran down her right arm to her hand and caused her to lose grip. *Id.* She said she used two inhalers daily to treat COPD. Tr. at 54. She indicated her respiratory symptoms were exacerbated if she smelled

perfume or exerted herself by walking a long distance or climbing stairs. *Id.* She reported having quit her half-a-pack-a-day smoking habit a month prior. *Id.* Plaintiff described her right knee as hurting most of the time and having a lot of bone deterioration such that she could not bend it or climb stairs. Tr. at 54–55. She noted her left knee was problematic, but the right was worse. Tr. at 55. She described herself as 5'2" tall and weighing 225 pounds. *Id.* She said her family doctor prescribed mental health medications, but she did not know if they were working because they recently changed. *Id.*

In response to questioning by her counsel, Plaintiff described having worked at her last job with a coworker who helped her perform her duties during the night shift because she was unable to do so. *Id.* She said she was unable to bend forward with her back and required a grabber to pick up things she dropped. *Id.* She described her diabetes as being somewhat controlled, but indicated she felt tired all the time. *Id.* She said her blood sugar ran about 125 in the mornings, but sometimes increased to 180 when she became upset. *Id.* She described numbness in her arms and right hand. Tr. at 57.

Plaintiff said she worked for as long as she could after her first disability denial, but indicated she was eventually fired because she was unable to perform her job. *Id.* She acknowledged having missed at least a week and a half of the month prior to being fired. *Id.*

Plaintiff reported having been injured in a car accident that totaled her car when she was hit from behind at full speed. *Id.* She said participated in many sessions of chiropractic therapy. *Id.* She said she drove as little as possible following the accident, but had to drive because her ex-husband did not have a license. Tr. at 58.

Plaintiff denied cooking, performing household chores, and attending church. *Id.* She indicated she and her husband typically ate out and she spent her days lying in bed. *Id.* She estimated she could sit in a straight chair for 20 minutes before needing to stand, could stand for five minutes, and could lift five pounds before her back and neck hurt. Tr. at 58–59. She described her medications as causing drowsiness and denied having restful sleep, but stated she napped for an hour or two at least three times during the day. Tr. at 59. She described pain in her left shoulder and trouble moving her arms due to pain. *Id.* She said she was right-handed. *Id.* She admitted her weight caused her knee pain and back problems. Tr. at 60. She said she was able to take care of her personal needs, but indicated she only bathed twice a week because she did not feel like bathing more often. *Id.* She said she could sometimes dress herself, but needed help during times when her neck and back pain were increased. *Id.* She stated she visited the free clinic and the mental health clinic because she did not have health insurance. Tr. at 60–61. She described problems concentrating due to her nerves. Tr. at 61.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Dr. Benjamin Johnston reviewed the record and testified at the hearing. Tr. at 61–71. The VE categorized Plaintiff's PRW as (1) CNA, medium, semiskilled, specific vocational preparation ("SVP") of 4, *Dictionary of Occupational Titles* ("*DOT*") No. 355.674-014, and (2) cloth inspector, medium, semiskilled, SVP of 3, *DOT* No. 689.685-038. Tr. at 62–63.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could occasionally reach overhead and frequently reach in all other directions; occasionally push and pull arm controls; occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs; occasionally push and pull leg controls or operate foot pedals; never work at unprotected heights or climb ropes, ladders, or scaffolding; occasionally interact with the general public; limited to simple, routine, repetitive tasks; maintain attention and concentration for up to two hours at a time; and frequently adapt to changes in the work setting or work routine. Tr. 63–64, 66. The VE testified the individual could not perform any of Plaintiff's PRW, but could perform the following jobs: (1) baker's line worker, light, unskilled, SVP of 2, *DOT* No. 524.687-022; (2) bottle line attendant, light, unskilled, SVP of 1, *DOT* No. 920.687-042; and (3) laundry folder, light, unskilled, SVP of 2, *DOT* No. 269.686-010, with 61,000, 35,000, and 30,000 positions available nationally, respectively.  Tr. at 64.

The ALJ provided a second hypothetical that modified the first to limit the individual to no more than five minutes of concentrated exposure to fumes, odors, gases, dust, pulmonary irritants, temperature extremes, humidity, and wetness. Tr. at 64–65. The VE testified there would be no work available for the individual because nearly every job at an unskilled level involves exposure to either dust, fumes, or odors. Tr. at 65.

The ALJ provided a third hypothetical that modified the second to limit the individual to occasional exposure to fumes, odors, gases, dust, pulmonary irritants, temperature extremes, humidity, and wetness. Tr. at 65–66. The VE testified the positions identified in response to the first hypothetical question would be available. Tr. at 66.

The ALJ provided a fourth hypothetical that modified the third to limit the individual to occasional handling, fingering, and feeling with the right dominant hand. *Id.* The VE testified there would be no work available for the individual. *Id.*

In response to questioning by Plaintiff's counsel, the ALJ testified there would be no work available for the individual in the first hypothetical if she were able to forward flex her back less than 10% of the workday. Tr. at 67–69. The VE testified if the individual in the first hypothetical did not have normal side-to-side range of motion of her head, it would be very difficult to perform the jobs cited or any other light work. Tr. at 69–70. The VE further

testified that if the person missed two to five days per month, she would be terminated. Tr. at 70.

The ALJ posed a fifth hypothetical that modified the third to preclude climbing of ropes, ladders, or scaffolding and working at unprotected heights. The VE testified the same positions would be available as in response to hypothetical 1, as very few, if any, jobs require any level of climbing beyond going up stairs. Tr. at 70–71.

### 2. The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.
2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.
3. The prescribed period ends on May 31, 2021. Exhibit B11D.
4. The claimant has not engaged in substantial gainful activity since May 26, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
5. The claimant has the following severe impairments: osteoarthritis of the knees, obesity, COPD, cervical degenerative disc disease with radiculopathy; lumbar degenerative disc disease, diabetes mellitus, bipolar disorder, and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).
6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally reach overhead and frequently reach in all other directions; could occasionally push and pull arm controls; could occasionally push and pull leg controls or operate foot pedals; could occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs; would be precluded from working at unprotected heights or climbing ropes, ladders, or scaffolds; could have occasional exposure to fumes, odors, gases, dusts, and other pulmonary irritants, as well as wetness and humidity; could only occasionally interact with the general public; could maintain attention and concentration for up to 2 hours a one time; could perform simple, routine, repetitive tasks; and could adapt to frequent changes in the work setting or work routine.

8. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9. The claimant was born on June 17, 1964 and was 50 years old, which is defined as an individual closely approaching advanced age on the alleged disability onset date (20 CFR 404.1563 and 416.963).

10. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

13. The claimant has not been under a disability, as defined in the Social Security Act, from May 26, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 15–36.

II. Discussion

Plaintiff alleges the Commissioner erred in failing to adequately consider the longitudinal record in evaluating her RFC. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial

gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ "cherrypick[ed]" the evidence, citing records that supported her conclusion and ignoring contrary evidence. [ECF No. 13 at 3]. She claims the ALJ mischaracterized evidence from 13 specific treatment records to support her RFC assessment. *Id.* at 3–10. The court focuses its inquiry on records Plaintiff alleges demonstrate the ALJ's failure to consider her subjective allegations of symptoms in assessing her RFC.[6]

The Commissioner argues the ALJ considered the longitudinal record and provided a comprehensive decision detailing her reasons for concluding Plaintiff was not disabled. [ECF No. 14 at 13]. He maintains the ALJ discussed relevant evidence related to Plaintiff's cardiovascular allegations, but correctly noted that examinations generally produced negative findings. *Id.* at 14–15. He contends the ALJ cited evidence of normal neurological findings in addressing Plaintiff's allegations regarding neuropathy and referenced generally well-controlled blood sugars in concluding no additional restrictions were needed to address diabetes-related symptoms. *Id.* at 15. He claims the ALJ cited generally normal respiratory findings to support the respiratory restrictions she included in the RFC assessment. *Id.* He argues the ALJ cited some abnormalities, but noted generally normal findings in

---

[6] The court has narrowed consideration to the records that support this argument and has declined to specifically discuss the other records given the recommendation for remand.

assessing restrictions imposed by Plaintiff's musculoskeletal impairments. *Id.* at 15–16. He maintains the ALJ considered Plaintiff's right knee impairment and her obesity in assessing the RFC, but also considered improvement to her knee with injections and other treatment. *Id.* at 16–17. He contends the ALJ noted Plaintiff's mental symptoms were generally associated with situational stressors and her mental status findings were typically normal, but still accounted for bipolar disorder and PTSD in limiting her to occasional interaction with the general public and simple, routine, repetitive tasks. *Id.* at 17. The Commissioner argues the ALJ's decision reflects her consideration of the medical opinions of record and Plaintiff's subjective statements, in addition to the objective medical findings. *Id.* at 17–18.

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). "Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). The second determination requires the ALJ to

consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the plaintiff's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] treating or nontreating source[s] or other persons about how [her] symptoms affect [her]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

In evaluating alleged symptoms, the ALJ is to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. "Other evidence that [the ALJ should] consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. § 404.1529(c)(3) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment an individual receives or has received for relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms). Pursuant to SSR 16-3p, the ALJ is to "explain which of an individual's symptoms [she] found consistent or inconsistent with

the evidence in his or her record and how [her] evaluation of the individual's symptoms led to [her] conclusions." *Id.* at *8. She must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

A claimant's RFC must be based on all the relevant evidence in the case record and should account for all the claimant's medically-determinable impairments. *See* 20 C.F.R. § 404.1545(a), 416.945(a). "'An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.'" *Lewis* , 858 F.3d at 869[7] (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). The RFC assessment must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions,

---

[7] In *Lewis*, 858 F.3d at 869, the court pointed out there was evidence of significant abnormal findings "[i]n the same medical records containing the 'normal' findings relied upon by the ALJ."

despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ determined Plaintiff's severe impairments included osteoarthritis of the knees, obesity, COPD, cervical degenerative disc disease with radiculopathy, lumbar degenerative disc disease, diabetes mellitus, bipolar disorder, and PTSD. Tr. at 16. In accordance with 20 C.F.R. § 404.1529 and § 416.929, she determined Plaintiff's impairments could reasonably produce the alleged symptoms. Tr. at 18. However, she determined Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record. *Id.* The ALJ found examinations produced "mostly" or "generally" normal findings and concluded Plaintiff's limitations did not preclude activities as described in the RFC assessment. *See* Tr. at 31, 32. She concluded Plaintiff had the RFC to perform a reduced range of light work. Tr. at 17–18.

Plaintiff maintains the ALJ ignored objective evidence, as well as her medical provider's indication as to how her symptoms affected her during a November 21, 2016 exam. [ECF No. 13 at 7]. A review of this record shows NP Lee's observation that Plaintiff was "in obvious pain." Tr. at 985. It also

reflects the following abnormal findings: bilateral spasms to Plaintiff's trapezium muscles; diffuse tenderness to the posterior aspect of the cervical spine; and limited ROM due to pain. Tr. at 986. The ALJ summarized the record as follows: "On November 21, 2016, the claimant's physician treated her for reportedly worsening neck pain with no trauma, providing an injection of Depo-Medrol, and Lidocaine patch; she also requested a prescription for Amitriptyline." Tr. at 25. The ALJ's decision contains no acknowledgement of the abnormalities NP Lee observed during the visit.

Plaintiff claims the ALJ failed to consider her medical provider's observations of her pain-related behavior during an exam on January 18, 2017. [ECF No. 13 at 6–7]. During this exam, NP Lee noted Plaintiff appeared to be uncomfortable and in pain and changed positions constantly. Tr. at 977. The ALJ's summary of the January 18, 2017 record contains no reference to NP Lee's abnormal findings. She wrote: "At her January 18, 2017 primary care visit, the claimant reported right upper quadrant pain, radiating to her back, with constipation and thin-appearing stools. Her lumbar range of motion was within functional limits, and she had 2/2 pulses and 5/5 muscle strength." Tr. at 26.

Plaintiff argues the ALJ mischaracterized a May 24, 2017 exam as reflecting "generally normal findings" and neglected abnormal findings. [ECF No. 13 at 6]. On May 24, 2017, NP Lee observed Plaintiff to ambulate with a

limp and require assistance getting on to the exam table. Tr. at 963. The ALJ discussed the record as follows:

> On May 24, 2017, the claimant reported the ER had diagnosed osteoarthritis but that their morphine injection and prescribed Norco were "not touching the pain." Physical examination showed generally normal findings in all systems, including psychiatric findings with appropriate mood and affect; and right knee findings unchanged from the previous visit. She was referred for an orthopedic evaluation. B16F/10–11.

Tr. at 27. The ALJ's discussion neglects NP's Lee observations that Plaintiff was ambulating with a limp and required assistance in getting on and off the exam table. Her characterization of "generally normal findings in all systems" and "right knee findings unchanged from the previous visit" ignores that NP Lee had indicated some abnormal findings on right knee exam during the prior visit. *See* Tr. 965 (reflecting valgus alignment, mild fine crepitus with flexion and extension, and tenderness to palpation at the medial joint line).

Plaintiff contends the ALJ neglected impressions in a June 1, 2017 ER record of severe pain and limited ROM, as well as her reports of symptom exacerbation with weight bearing and walking. [ECF No. 13 at 8]. The ALJ discussed the June 1, 2017 ER record, as follows:

> On June 1, 2017, the claimant sought ER treatment for reported right knee pain persisting 2 months. She had high blood pressure and pulse; and right knee swelling and tenderness; but otherwise normal findings, including musculoskeletal and psychiatric findings. She was given prescriptions for Diclofenac and Norco. Exhibit B17F/16–19.

Tr. at 27. A review of the June 1, 2017 ER record reveals abnormal findings the ALJ ignored, including Dr. Ardis's observation of restricted ROM of Plaintiff's right anterior knee, as well as Plaintiff's reports that her right knee pain was severe and that her pain and swelling were exacerbated by bearing weight and walking. Tr. at 1024–25.

For an ALJ's evaluation of a claimant's subjective allegations to be supported by substantial evidence, the ALJ must consider all the relevant evidence. *See generally* SSR 16-3p, 20 C.F.R. §§ 404.1529, 416.929. As discussed above, the ALJ neglected to consider some objective signs on exam that were contrary to her impression of "generally normal" findings, including observations of muscle spasms, spinal tenderness, limited ROM of the cervical spine, ambulation with limp, valgus alignment of the right knee, mild fine crepitus of the right knee with flexion and extension, and restricted ROM of the right knee. *See* Tr. at 963, 965, 986, 1024–25. Although the ALJ cited some of these impressions during other exams she discussed in her decision, her failure to note similar findings in multiple exams arguably influenced her conclusion that Plaintiff's subjective allegations were not consistent with the evidence.

Pursuant to 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4) and SSR 16-3p, in considering how a claimant's symptoms affect her ability to perform basic work activities, the ALJ is to consider impressions from the claimant's

treating medical providers as to the effect of symptoms. The court's review of the ALJ's decision shows that she ignored some of Plaintiff's medical providers' notations of pain-related behaviors. As discussed above, the ALJ ignored NP Lee's observations that Plaintiff was in obvious pain, shifted uncomfortably during an exam, and had difficulty getting on the exam table.[8] Tr. at 963, 977, 985. NP Lee's observations are consistent with Plaintiff's subjective allegations of pain, and the ALJ's failure to consider them was arguably prejudicial to Plaintiff.

Also pursuant to 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p, the ALJ is to consider factors that precipitate and aggravate symptoms. The ALJ ignored Plaintiff's report to Dr. Ardis that her knee pain was exacerbated by bearing weight and walking. *See* Tr. at 1024–25. Notably, the ALJ assessed an RFC for light work, which requires an individual to engage in "a good deal of walking or standing" or to push or pull arm or leg controls. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b). She assessed this RFC without resolving evidence that Plaintiff's symptoms would be exacerbated by the physical demands of light work.

---

[8] The undersigned's review reveals additional examples of the ALJ's failure to consider Plaintiff's providers' impressions of pain-related behavior, including observations that she was in mild distress, was crying because of pain, and appeared to be in pain during exams. *See* Tr. at 715, 974, 979, 982, 983, 1095. Although the court considers only the examples cited by Plaintiff in ordering remand, the Commissioner should consider all of Plaintiff's providers' impressions as to her pain-related behavior on remand.

Because the ALJ neglected to consider and resolve evidence pertinent to evaluation of the intensity, persistence, and limiting effects of Plaintiff's symptoms, the court is unable to determine whether the RFC assessment adequately reflects the extent to which Plaintiff's impairments limit her ability to perform basic work activities.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

February 20, 2020                         Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge